IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NORTHERN DIVISION

In re:  
BIG DOG II, LLC,  
*Debtor*.

Case No.: 19-30284-JCO  
Chapter 11

MEMORANDUM OPINION AND ORDER
DENYING CREDITOR BGVM FINANCE III, LLC'S MOTION TO DISMISS (DOC. 35)
AND CONDITIONALLY DENYING CREDITOR BGVM FINANCE III, LLC'S MOTION FOR
RELIEF FROM STAY (DOC. 36)

This matter came before the Court for a hearing on June 28, 2019, on Creditor BGVM Finance III, LLC's Motion to Dismiss and Motion for Relief from Stay (collectively "the Motions") (Docs. 35, 36) and Debtor's Response in Opposition thereto. (Docs. 45, 46). Appearances were as noted on the record.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the order of reference of the District Court dated October 7, 1986. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and (G), and the Court has authority to enter a final order.

The Court has considered the record, the motions, responses, exhibits admitted into evidence, and the testimony of the witnesses, as well as the arguments of counsel. The case was well-presented by both sides. Having considered the foregoing, the Court finds that the Motion to Dismiss is due to be DENIED. The Court further finds that the Motion for Relief from Stay is CONDITIONALLY DENIED as explained in more detail below. The Court further finds as follows.

FINDINGS OF FACT

Big Dog II, LLC ("Debtor"), filed a Voluntary Petition for Relief ("Petition") on March 15, 2019 (the "Petition Date"), commencing this case. Prior to the hearing on this matter, the

parties filed a Joint Stipulation of Fact, (Doc. 74), which the Court adopts and sets out the relevant portions herein below.

BGVM is the owner and holder of various loan documents executed by Debtor, including but not limited to, a promissory note executed on August 12, 2010 by Debtor ("Note"), which is secured by a mortgage and security agreement executed contemporaneously therewith ("Mortgage") which encumbers the real property and improvements located at 654 Anchors Street NW, Fort Walton Beach, Okaloosa County, Florida (the "Property"), as well as an Assignment of Rents and Leases which further secures repayment of the indebtedness.  The Debtor owns the Property subject to the Mortgage held by BGVM.  The Debtor is a single asset real estate debtor.

On August 23, 2018, BGVM commenced a state court foreclosure action against Debtor and its guarantors resulting in the case styled *BGVM Finance III, LLC v. Big Dog II, LLC, et al.,* pending in the First Judicial Circuit in and for Okaloosa County, Florida ("State Court"), bearing Case No. 2018 CA 003066 F (the "State Court Action").

On October 25, 2018, the State Court entered its Order Granting BGVM's Motion to Direct Rental Income Stream (the "Assignment of Rents Order") in the State Court Action, requiring the tenant in the Property to pay rents directly to BGVM.  Prior to the Petition Date, BGVM was collecting the rents for the Property pursuant to the Assignment of Rents Order.
The Debtor and BGVM entered into a pre-petition Settlement Stipulation ("Stipulation") in the State Court Action which provided that Debtor would pay the Debt, as defined in the Stipulation, in full on or before March 18, 2019.

In the event the Debtor failed to pay the Debt in full on or before March 18, 2019, the Stipulation provided BGVM with the option of (a) submitting an Agreed Final Judgment of Foreclosure to the State Court, in the form attached to the Stipulation, in the agreed amount of

$5,481,924.10, or (b) recording one or both of the quit claim deeds which were executed with the Stipulation and escrowed with BGVM pending March 18, 2019.

The Debtor filed its Petition three (3) days before the Debtor's obligations matured pursuant to the pre-petition Stipulation. The Debtor's filing of the Petition prevented BGVM from moving forward with the agreed upon relief under the Stipulation. BGVM filed a secured proof of claim in the amount of $5,682,215.17. (Claim 3-1).

At the hearing, Fred Thomas testified as the corporate representative. Mr. Thomas is the fifty percent owner of corporate Debtor, and is designated as the corporate representative. The other owner is Nate Smith, and he is designated as the manager of the Debtor. The Debtor has no employees.

BAE Systems Technology Solutions & Services, Inc. ("BAE") is the only tenant on the Property pursuant to a Commercial Lease Agreement dated December 15, 2016, which was later amended in July of 2018. BAE leases approximately 82% of the available warehouse space, leaving approximately 18% of the warehouse space on the Property vacant. Previously, the Debtor leased the space to NJJ Power Services, LLC. In 2016, NJJ Power Services, LLC defaulted on its lease, and failed to vacate the Property. It was necessary for the Debtor to file suit and expend significant resources to evict the former tenant. This expense and corresponding loss of income caused the Debtor to fall behind in payments and default on the Note. The Debtor's current income is derived solely from the rent received from BAE. BAE has never defaulted under its lease terms and remains in good standing under the lease. Because BAE's rent payment is insufficient to service the debt on the Property, the members of Debtor have been making up the shortfall. Mr. Thomas testified the Debtor's Plan proposed that the members of

the Debtors would continue making up the shortfall. There was no testimony regarding the members' ability to continue making those payments.

BGVM alleges that, among other things, Debtor's "eleventh hour" filing for bankruptcy evidences bad faith and requests dismissal for cause or relief from the stay for cause to pursue its state court remedies on this basis. BGVM also asserts that Debtor's inability to effectuate a confirmable plan within a reasonable time further supports its requests for relief.

The Debtor opposes the requested relief on the grounds that it has an honest intention to reorganize through the restructuring of its debts by reamortizing the debt owed to BGVM and utilizing rents from BAE, its anchor tenant, as income to fund the plan. In support of this argument, Mr. Thomas testified that for approximately one year, the Debtor has been actively pursuing refinancing of the BGVM debt with multiple banks. The only bank Mr. Thomas could specifically identify as being willing to consider refinancing with the Debtor was Centennial Bank. Inexplicably, Mr. Thomas could not specifically state any other banks to which he and Nate Smith had reached out or which had expressed a willingness to lend to the Debtor. Regardless, Mr. Thomas testified with confidence that there was at least one bank with which refinancing could occur within sixty days. Mr. Thomas further testified that the Property is insured.

With regard to whether there is equity in the Property, Mr. Thomas testified that there is. As part owner of the Property, he testified he believed the Property was worth roughly $6.4 million,[1] and estimated the debt owed to BGVM to be between $5.4 and $5.6 million. Mr. Thomas

---

[1] The Court accepts Mr. Thomas's testimony pursuant to Rule 701 of the Federal Rules of Evidence regarding opinion testimony of a lay witness. Testimony presented pursuant to Rule 701 is acceptable where it is rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determine a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 of the Federal Rules of Evidence regarding expert witnesses. Any flaws in the lay testimony go toward the weight of the

did not know at what rate interest was accruing, and no evidence was otherwise presented by either party as to whether interest was accruing at the contract rate or the default rate. Mr. Thomas also testified that the Property had been on the market for approximately two years, with a listed sales price of $6.7 million. Mr. Thomas admitted that no offers over $5.5 million have been presented.

In support of a $6.57 million valuation, the Debtor called expert witness Walter Humphrey to testify. Mr. Humphrey is a state-certified General Real Estate Appraiser in the local Fort Walton Beach area. According to his Appraisal Report, Mr. Humphrey was hired by Debtor's counsel to appraise the market value of the Property for use in bankruptcy proceedings. (Debtor's Exhibit 1). At the time Mr. Humphrey appraised the Property, it had been listed for sale for two years. Mr. Humphrey used a variety of valuation methods to arrive at his $6.57 million valuation. First, he used the sales comparison approach based on three different comps, all of which were local, smaller than the subject Property, and in close proximity thereto. The comparable properties had a range of $50.82-$60.98 per square foot, and Mr. Humphrey admitted under cross examination that smaller properties sell for more per square foot than larger properties, even when the amenities are largely the same or similar. Despite the subject Property being larger in square footage than the comparable properties, Mr. Humphrey applied a $60.00 per square foot calculation rendering a market value of $6.85 million under the sales comparison approach. Next, Mr. Humphrey utilized the Direct Capitalization Method under the income approach to conclude that the Property has a value of $6,565,000.00. In order to calculate the di-

---

testimony rather than its admissibility. *In re Ward,* 2017 WL 3084381 (Bankr. E.D. N.C. July 19, 2017).

rect capitalization rate, Mr. Humphrey applied two sub-methods: the capitalization rate estimation and the band of investment estimation. For each estimation, Mr. Humphrey used different mortgage constants resulting in two different values. He testified that the reason for using different constants was to create a range of values for the Property, which he stated was representative of what a bank may see if they performed this calculation themselves, even though ordinarily, the same mortgage constant would be used under both estimations. (*See* Debtor's Ex. 1 at 45-46).

On cross examination by counsel for BGVM, Mr. Humphrey admitted that he had been disciplined regarding a violation of competency under the USPAP rules governing appraising ethics. He could not recall whether his expert testimony had been stricken from the record of court proceedings in the past due to his conduct violations, but asserted that his appraising credentials had been reinstated without restriction after the disciplinary period was complete.

To dispute the Debtor's valuation, BGVM put on their own expert witness, Brent Scott. Mr. Scott is a Vice President for the Florida Caribbean Region of CBRE Valuation and Advisory Services. Mr. Scott utilized the sales comparison approach to reach the conclusion that the Property has a value of $5.4 million. Mr. Scott compared eight similar properties geographically diverse but similar in condition, square footage, and tenant desirability. He adjusted each comparable property upward or downward depending on its pros and cons, concluding that the subject Property has an average value of $46.385 per square foot or $5,300,000.00. (Doc. 72 at 60). Mr. Scott also utilized the Direct Capitalization Method under the income approach, which calculates value based on the net income, risk, and overall income capabilities of the subject Property. Considering these factors, Mr. Scott concluded that the subject Property had a range of compara-

ble capitalization rates between 7.74% and 8.43%. As part of his appraisal, Mr. Scott interviewed a regional broker who concluded that due to the short remaining lease term[2] with the Debtor's anchor tenant, above market rents and larger size of the subject, a capitalization rate around 8.75% to 9.25% would be reasonable for the subject property. Based on this, Mr. Scott used a 9% overall capitalization rate resulting in an as is value of $48.28 per square foot or $5,450,000.00.

The Court found all the witnesses to be credible, honest, and forthright. There was considerable agreement between the parties about many of the facts regarding the Property, and, by and large, the only glaring contradiction in the testimony was each appraiser's opinion on the appropriate properties to be used as comparables, the proper constant to be used in the income approach, and the proper adjustments per square foot of the comparable properties. This Court felt each party presented its case fully and provided the Court with enough information that the Property can be valued for purposes of BGVM's Motion for Relief from Stay.

CONCLUSIONS OF LAW

BGVM seeks relief from the stay under Section 362(d)(1) for "cause" alleging that BGVM is not adequately protected, and under (d)(2) for "cause" because the Debtor lacks equity in the Property and the Property is not necessary to an effective reorganization. "'Cause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re Indian River Estates, Inc.*, 293 B.R. 429 (Bankr. N.D. Ohio 2002). Thus, whether cause exists to grant the requested relief is determined by the court "on a

---

[2] Though the remaining lease term for the anchor tenant is short, the fact that the tenant was permitted to use its monthly rent payments to improve the Property for its manufacturing needs leads the Court to conclude that it is more likely than not that the tenant intends to remain in the Property beyond when the current lease term expires.

7

case-by-case basis" and further "may be reversed only upon a showing of abuse of discretion." *See In re Bryan Road, LLC,* 382 B.R. 844 (Bankr. S.D. Fla.2008) (citing, *In re Dixie Broad., Inc,* 871 F.2d 1023, 1026 (11th Cir. 1989); *See also, e.g., In re Jefferson County, Alabama*, 484 BR. 427 (Bankr. N.D. Ala. 2012).

Here**,** regarding relief from stay for lack of adequate protection, a creditor must demonstrate that it is entitled to "adequate protection as a condition to the continuation of the automatic stay to compensate or protect the creditor from a decrease or threatened decrease in the value of the estate's interest in property that is the creditor's collateral as a result of the automatic stay." *In re Young,* 2011 WL 3799245, at *7 (Bankr. D.N.M. Aug. 29, 2011).

> A decline in the value of the estate's interest in property that is the creditor's collateral, which entitles the creditor to adequate protection, can result from such causes as a decline in the market value of the collateral, non-payment of interest accruing on a senior lien, or nonpayment of property taxes having priority over the creditor's lien. A threatened decline in the value of a creditor's collateral entitling the creditor to adequate protection can occur, for example, from lack of insurance, failure to maintain the collateral, failure to permit periodic inspections, or a failure to report information affecting the collateral. If a secured creditor has a security cushion sufficient to protect it from the declining value of its collateral, then the security cushion may provide adequate protection for the declining value. What constitutes adequate protection is a question of fact to be determined on a case-by-case basis.

*Id.*

Prevailing case law holds that, if an equity cushion is sufficient in amount to protect the secured creditor from post-petition depreciation of the value of its interest in the collateral, the equity cushion is said to provide sufficient adequate protection to the secured creditor. *See In re Mellor,* 734 F.2d 1396, 1400 n. 2 (9th Cir. 1984).

The mere existence of an equity cushion does not constitute adequate protection per se, however. The critical question in this case is, what amount of equity cushion is sufficient to preserve the status quo? A detailed review of the relevant case law indicates that generally, a 20% or greater equity cushion is deemed sufficient by the courts. *See In re Senior Care Properties, Inc.,* 137 B.R. 527, 528-29 (Bankr. N.D. Fla. Feb. 25, 1992)(analyzing the sufficiency of various equity cushions)**.** An equity cushion of 0% to 11% has generally been held to be insufficient, and case law is divided on whether a cushion of 12% to 20% constitutes adequate protection. *In re James River Assocs.,* 148 B.R. 790, 796 (E.D. Va. 1992).

In order to determine the equity cushion, the Court must settle on a value for the Property. The parties each submitted appraisals of the Property and presented expert testimony as to the value thereof. "The valuation of property is an inexact science and whatever method is used will be only an approximation and variance of opinion by two individuals does not establish a mistake in either." *In re Gustav Schaefer Co.,* 102 F.2d 237 (6th Cir. 1939). "[V]aluation is ultimately the opinion of a particular appraiser and, as such, the weight to be accorded the opinion rests upon a number of factors frequently used by courts in evaluating appraisal testimony. A nonexclusive listing of these factors includes: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 61 (B.A.P. 6th Cir. 2012).

The Court is "not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property . . . ." *In re Smith*, 267 B.R. 568,

572–73 (Bankr. S.D. Ohio 2001).  In forming its own opinion, the Court must weigh the evidence presented in support of each party's proposed valuation and may arrive at a different value than any of the valuations presented.  *Id.*

### Application

This Court has considered the experience, methodology and demerits of each of the parties' appraisers.  Each appraiser's testimony demonstrated that their appraisal methodology was a scientific way of coming up with an estimate of value.  Nevertheless, they are each still estimates.  Because Mr. Humphrey used different mortgage constants (when the industry standard requires the constant to remain the same) in his income approach, his valuation resulted in a range of values, which the Court found less reliable.  Therefore, the Court applies more weight to BGVM's valuation of the property than to Debtor's valuation.

Using the debt amount in BGVM's proof of claim, which is in line with the upper end of what Mr. Thomas testified the Debtor owes BGVM, and BGVM's fair market value of $5,450,000, the Debtor would have no equity in the Property.  Using the Debtor's fair market value calculation of $6,565,000, the Debtor would have a 14.69% equity cushion, which is still below the preferred 20% cushion relied upon by most courts.  Having considered the two appraisals and after giving them the appropriate evidentiary weight, the Court began with BGVM's valuation and has factored in Mr. Thomas's testimony regarding the anchor tenant's recent improvement to the Property for its manufacturing needs, and his further testimony that the Debtor had just received a letter of intent to lease out the remainder of the Property to an additional tenant.  After these positive adjustments, the Court finds the value of the Property to be approximately $5,896,000.00.  The Court's valuation results in a small equity cushion of 3.62%.

Whether an equity cushion is sufficient to adequately protect a creditor's interest should be determined on a case by case basis after consideration of all relevant facts rather than by mechanical application of a formula. Mr. Thomas testified that the roof needs repairing, there is a sinkhole in the parking lot that needs to be addressed, and four of the twelve air conditioning units on site need to be serviced or replaced. The parties have agreed that the Debtor may use current rental income from the Property to pay for necessary maintenance, and the Debtor has used that income to replace eight of the twelve air conditioning units. The Debtor's need to use current rental income to do required maintenance and the lack of a maintenance reserve fund, combined with Mr. Thomas' testimony that the members of the Debtor are currently having to cover the payment shortfall on the Note, causes the Court to question the Debtor's ability to properly fund the regular maintenance of the Property going forward. *See In re Inwood Heights Housing Development Fund Corp.*, 2011 WL 3793324, *4 (Bankr. S.D.N.Y. Aug. 25, 2011)("the requirement that [the debtor] maintain replacement and operating reserves is important, because these coffers are what the [debtor] is supposed to use to fund maintenance and repairs of the Property."). Mr. Thomas also testified that the quarterly sales tax has not been timely paid, nor have the property taxes been timely paid, which threaten BGVM's status as a priority lien holder. Given these facts, the Court finds that, regardless of whether there is a 3% equity cushion or a 14% equity cushion, BGVM is not adequately protected. However, the Court found credible Mr. Thomas's assertions that the Property could be refinanced quickly. Consequently, the Court is inclined to allow the Debtor ninety days to complete refinancing as long as BGVM can be adequately protected in the interim. To do so, it will be necessary for the Debtor to continue making adequate protection payments to BGVM while it seeks refinancing. Mr. Thomas testified that

the Property is insured, which lends further assurance to the Court that BGVM will not be harmed by giving the Debtor additional time to refinance.

Based on the foregoing, this Court finds that the Motion for Relief from Stay is conditionally DENIED at this time; however, the stay SHALL lift ninety (90) days from the date of this Order without further hearing or order from this Court if the Debtor has not completed refinancing and paid off BGVM by that time. In the interim, the Debtor shall make monthly adequate protection payments to BGVM in the amount equal to interest at the applicable nondefault contract rate of interest on the value of the creditor's interest in the Property which is evidenced by the Proof of Claim filed by BVGM.

The parties are ORDERED to proceed in good faith with each other, and BGVM is ORDERED to cooperate with the Debtor's refinancing efforts, supplying a payoff amount and any other documentation necessary for Debtor to complete the refinance process. Failure to proceed in good faith by either party shall be brought to the Court's attention by way of a motion for sanctions.

BGVM's Motion to Dismiss is DENIED without prejudice at this time.

Dated:  July 18, 2019

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE

Attorney for BGVM Finance III, LLC is directed to serve a copy of this Order on interested parties and file a certificate of service within 3 business days of entry of the Order.